UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOHN D. WUCHENICH, M.D.,
Plaintiff-Appellant,

v.

SHENANDOAH MEMORIAL HOSPITAL;

No. 99-1273

ROBERT KARMY, M.D.; DAVID
CIOCHETTY, M.D.; GEORGE PHILLIPS,
M.D.,
Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Virginia, at Harrisonburg.
James H. Michael, Jr., Senior District Judge.
(CA-98-41-5)

Argued: January 28, 2000

Decided: May 22, 2000

Before NIEMEYER, Circuit Judge, HAMILTON,
Senior Circuit Judge, and Frederic N. SMALKIN,
United States District Judge for the District of Maryland,
sitting by designation.

_____

Affirmed in part, vacated in part, and remanded by unpublished per
curiam opinion.

_____

**COUNSEL**

**ARGUED:** Edward B. Lowry, MICHIE, HAMLETT, LOWRY,
RASMUSSEN & TWEEL, P.C., Charlottesville, Virginia, for Appel-

lant. Gregory Thomas St. Ours, WHARTON, ALDHIZER & WEA-VER, P.L.C., Harrisonburg, Virginia, for Appellees. **ON BRIEF:** Robert A. Kantas, MICHIE, HAMLETT, LOWRY, RASMUSSEN & TWEEL, P.C., Charlottesville, Virginia, for Appellant. Marshall H. Ross, WHARTON, ALDHIZER & WEAVER, P.L.C., Harrisonburg, Virginia, for Appellees Hospital and Karmy; C.J. Steuart Thomas, III, Randall T. Perdue, TIMBERLAKE, SMITH, THOMAS & MOSES, P.C., Staunton, Virginia, for Appellee Ciochetty; William D. Cremins, Jennifer E. Cremins, CREMINS & ASSOCIATES, P.C., Fairfax, Virginia, for Appellee Phillips.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Pursuant to Federal Rule of Civil Procedure 12(b)(6) (Rule 12(b)(6)), the district court dismissed the complaint of Dr. John Wuchenich, M.D. (Dr. Wuchenich), a professionally licensed anesthesiologist, alleging numerous causes of action under Virginia law, premised upon diversity jurisdiction, against Shenandoah Memorial Hospital (SMH) and/or three fellow physicians in connection with the lack of patient volume in his anesthesiology practice and SMH's revocation of his medical staff privileges. Dr. Wuchenich appeals the district court's dismissal of his complaint. For the reasons that follow, we affirm in part, vacate in part, and remand for further proceedings.

I

Because this case is before us on appeal from a Rule 12(b)(6) dismissal, we must accept all of the factual allegations contained in Dr. Wuchenich's complaint as true and draw all reasonable factual inferences therefrom in his favor. See Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). In light of this mandate, the facts for purposes of this appeal are as follows.

2

In April 1995, SMH, located in Woodstock, Virginia, recruited Dr. Wuchenich as an anesthesiologist to provide services to its patients. At that time, Dr. Wuchenich was practicing anesthesiology in his well-established private medical practice in California. In August 1995, Dr. Wuchenich and SMH entered into a written twelve-month agreement (the Physician Guarantee Agreement or the Agreement), which guaranteed Dr. Wuchenich an income of $15,000 per month for the first four months after he obtained medical staff privileges at SMH. The Physician Guarantee Agreement also called for Dr. Wuchenich to repay any monies received from the income guarantee over the ensuing eight-month period to the extent he earned an income over $15,000 a month. Dr. Wuchenich alleges that SMH induced him to sign the Physician Guarantee Agreement by orally assuring him that it would be hiring more surgeons, updating its equipment, and making other changes that would ensure his success in establishing an anesthesiology practice at SMH.

Of relevance to the issues on appeal, Article I of the Physician Guarantee Agreement provided as follows:

> [Dr. Wuchenich], in consideration of the covenants and agreements made by [SMH] contained herein, covenants and agrees to practice medicine in the specialty of Anesthesia at [SMH] and upon the effective date hereof to immediately apply, become upon commencement of this medical practice at [SMH] and remain continuously during the term of this Agreement, a member of [SMH's] Active Medical Staff as defined in its Medical Staff Bylaws subject, however, to said Bylaws.

(J.A. 34-35). Also of relevance to the issues on appeal, Article XVII of the Physician Guarantee Agreement contained the following merger clause:

> This writing constitutes the entire agreement between [Dr. Wuchenich] and [SMH]. No oral or written prior or contemporaneous agreements shall have any force or effect, nor shall any subsequent agreements have any force or affect [sic], unless signed and embodied in writing.

3

(J.A. 41).

By its terms, the Physician Guarantee Agreement was not terminable at will. Specifically, Article IV provided for an effective duration of twelve months from the date Dr. Wuchenich began practice in Woodstock, Virginia, unless earlier terminated as provided in the Agreement. For example, Article VIII provided that the Agreement would terminate if Dr. Wuchenich became mentally ill in the opinion of a panel of three independent health practioners so that he became unable to carry on the practice of anesthesiology for a period of three months.

In accord with the terms of the Physician Guarantee Agreement, upon the effective date of that Agreement, Dr. Wuchenich immediately applied for medical staff privileges at SMH. SMH in turn granted him medical staff privileges.

After setting up his practice in Woodstock, Dr. Wuchenich did not receive a warm reception from several of the physicians who practiced at SMH. For example, Dr. George Phillips (Dr. Phillips), the only other physician practicing anesthesiology at SMH prior to Dr. David Ciochetty (Dr. Ciochetty) arriving to fill the position of Chief of Anesthesiology in the early spring of 1996, engaged in several actions in an effort to quell competition from Dr. Wuchenich. First, although Dr. Wuchenich postponed two surgeries for medical reasons on patients of Dr. Baumunk, an orthopedic surgeon, Dr. Phillips falsely told Dr. Baumunk that the postponements were unnecessary, and that Dr. Wuchenich "was not a very good anesthesiologist." (J.A. 13). Thereafter, Dr. Baumunk refused to use Dr. Wuchenich's services for a period of three months. Second, in his capacity as senior anesthesiologist at SMH, Dr. Phillips instigated the implementation of a new policy causing all operating room cases to be assigned to anesthesiologists according to surgeon request. He then asked all surgeons to request him for their anesthesia needs, indicating to them that Dr. Wuchenich was less than competent. Third, prior to the time the surgeon request policy was in place, Dr. Phillips, in his capacity as senior anesthesiologist assigned the vast majority of cases to himself and to Certified Registered Nurse Anesthetists (CRNA) performing services under his supervision, for which he was compensated.

4

Another example of hostility encountered by Dr. Wuchenich at SMH related to SMH's appointment of a Chief of Anesthesiology. Prior to Dr. Ciochetty's appointment to the position of Chief of Anesthesiology, CRNA Clark held the position. After CRNA Clark resigned, Dr. Wuchenich inquired regarding the availability of the position of Chief of Anesthesiology at SMH and requested a job description. SMH refused to provide him with a job description and shortly thereafter told him in a letter dated January 17, 1996, that it intended to continue to fill the position with a CRNA. SMH then approved a thirty-day appointment of CRNA Hubbard pending completion of her application. CRNA Hubbard is the wife of Dr. C. Hubbard, an orthopedic surgeon who practiced at SMH. By hiring CRNA Hubbard in this fashion, SMH facilitated and participated in a plan to allow Dr. Phillips to maintain control of two operating rooms thereby ensuring that Dr. Wuchenich would not succeed financially.

Approximately six weeks later, in March 1996, without consulting Dr. Wuchenich or Dr. Phillips, SMH circulated a memorandum announcing that it had contracted with Dr. Ciochetty to become Chief of Anesthesiology. SMH did not ask for Dr. Wuchenich's opinion regarding what effect the hiring of a third anesthesiologist would have on his ability to earn a living, nor did SMH pay any attention to the fact that there was an insufficient number of anesthesiology patients to support the practices of two or more anesthesiologists and several CRNAs.

Upon his appointment as Chief of Anesthesiology, Dr. Ciochetty stated that he would be assigning all anesthesia cases. Concerned about the effect a third anesthesiologist would have on his practice, Dr. Wuchenich asked Dr. Ciochetty how he planned to deal with the apparent lack of work to support three anesthesiologists and expressed his concern that there was insufficient work for two anesthesiologists. Dr. Ciochetty responded that Dr. Wuchenich would not need to work full time and that whatever SMH had promised him was "`old news'" because he (Dr. Ciochetty) was in charge, and SMH had hired him to do things his way. (J.A. 15). In his capacity as Chief of Anesthesiology, acting for his own independent benefit and acting in conspiracy with SMH, Dr. Ciochetty picked up where Dr. Phillips left off, assigning the vast majority of cases to himself and the CRNAs whom he was paid to supervise.

5

On or about March 20, 1996, Dr. Phillips and Linda Aleska, the Co-Chief Operating Officer of SMH, had a conversation during which Linda Aleska stated that "they would have to get rid of Dr. Wuchenich because he won't work with us." (J.A. 15) (internal quotation marks omitted). On or about April 15, 1996, SMH unexpectedly forced Dr. Phillips to resign his medical staff privileges at SMH.

After Dr. Phillips resigned, SMH, in consultation with Dr. Ciochetty, once again began recruiting another anesthesiologist, despite the fact that Dr. Wuchenich had voiced his concerns over the lack of sufficient cases for two, let alone three, anesthesiologists. As part of SMH's recruiting efforts, in May 1996, Dr. Ciochetty sent a note to Jim Greer stating that he (Dr. Ciochetty) would need a partner for his pain clinic, even though Dr. Ciochetty had not discussed personnel needs with Dr. Wuchenich.[1] In sending this letter, Dr. Ciochetty acted in his capacity as Chief of Anesthesiology, for his own economic benefit, as well as in conspiracy with SMH to injure Dr. Wuchenich.

In addition to Dr. Phillips and Dr. Ciochetty's hostile actions towards Dr. Wuchenich, Dr. Wuchenich was subjected to hostile conduct by Dr. Robert Karmy (Dr. Karmy). At the same time SMH engaged in efforts to recruit Dr. Wuchenich, and after Dr. Wuchenich accepted SMH's offer, SMH engaged in efforts to recruit Dr. Wuchenich's sister, Dr. Nanette Wuchenich. Dr. Nanette Wuchenich maintained a successful medical practice in obstetrics and gynecology (OB/GYN) in California. As an experienced, practicing OB/GYN physician, Dr. Nanette Wuchenich posed a financial threat to Dr. Karmy, who at the time was the only OB/GYN physician on staff at SMH, and in the City of Woodstock. As a result of this financial threat, Dr. Karmy had an openly hostile attitude toward Dr. Wuchenich in hopes of scaring off Dr. Wuchenich's sister from accepting medical staff privileges at SMH. Out of the dozens of cases performed by Dr. Karmy during Dr. Wuchenich's time at SMH, Dr. Wuchenich was only assigned four of them and none at the request of Dr. Karmy. Dr. Karmy falsely reported to Dr. Ciochetty, the Chief of Anesthesiology at SMH, that Dr. Wuchenich possibly committed malpractice with respect to two cases. These two cases ultimately

---

[1] The complaint does not allege any facts describing the identity of Jim Greer.

6

came before the Peer Review Committee for evaluation of Dr. Wuchenich's professional performance.

On or about May 28, 1996, at a regularly scheduled Peer Review Committee meeting, four cases in which Dr. Wuchenich was involved, including the two instigated by Dr. Karmy, were reviewed. None of the patients involved in the four cases suffered any adverse consequences as a result of the care provided by Dr. Wuchenich. Nor did the Peer Review Committee obtain an opinion from an anesthesiologist with respect to the actions of Dr. Wuchenich in the four cases. Furthermore, the Peer Review Committee did not give Dr. Wuchenich an opportunity to respond to any allegations made against him. In spite of these facts and the fact that the actions of Dr. Wuchenich were within the relevant standard of care for anesthesiologists in each of the four cases, the Peer Review Committee recommended to the Executive Committee of SMH that Dr. Wuchenich's privileges to practice at SMH be revoked.

Dr. Wuchenich then received a letter dated May 31, 1996 (the Suspension Letter), which stated, inter alia:

> Based upon the results of the Peer Review, the Executive Committee of the General Medical Staff has recommended that your privileges be suspended at Shenandoah Memorial Hospital. Based upon this recommendation and the fact that the allegations pertain to matters that could endanger the safety and well-being of patients, the acting Chief Executive Officers have directed that you be removed from On Call status until further notice. This action is deemed necessary based upon the results of the Peer Review and the facts surrounding the cases that were submitted for review.

(J.A. 49). SMH then promptly reported Dr. Wuchenich's suspension to the State Board of Medical Examiners. SMH knew the State Board of Medical Examiners would in turn report the suspension to the National Practitioner's Data Bank, which would operate as a bar to Dr. Wuchenich obtaining medical staff privileges at any other hospital in the United States.

On September 12, 1996, SMH held a hearing to review Dr. Wuchenich's suspension. SMH appointed attorney Paul Neal as the hear-

7

ing officer. Paul Neal also serves as legal counsel to SMH. Paul Neal along with six members of SMH's medical staff not previously mentioned constituted the hearing committee (the Hearing Committee). The Hearing Committee heard opinions from anesthesiologists relating to Dr. Wuchenich's four cases. None stated they believed suspension of Dr. Wuchenich's medical staff privileges was appropriate. Indeed, the only two outside expert anesthesiologists to testify were brought by Dr. Wuchenich. These two experts testified without contradiction that Dr. Wuchenich did not depart from the appropriate standard of care for anesthesiologists with respect to the four cases at issue.

On September 24, 1996, the Hearing Committee issued its report. In its report, the Hearing Committee recommended that Dr. Wuchenich's medical staff privileges be reinstated, but that he undergo proctoring, education, and training as follows: (1)"Observation by Staff Anesthesiologist of not less than five inductions including at least two obstetric inductions"; (2) "In service training in the troubleshooting and repair of the specific pieces of anesthesia equipment in use at SMH"; and (3) "In service training as to the location of anesthesia related equipment and resuscitation equipment in the Operating Room at SMH." (J.A. 20). The Hearing Committee forwarded its report to SMH's Medical Staff Executive Committee, which in turn recommended to the Board of Directors of SMH that: (1) Dr. Wuchenich's medical staff privileges be reinstated; (2) prior to engaging in further work at SMH, Dr. Wuchenich should be observed by a Director of Anesthesiology at a health care facility on not less than twenty-five inductions, including at least five obstetric inductions; (3) prior to engaging in further work at SMH, Dr. Wuchenich should participate in an in service training program on the trouble shooting and repair of four particular pieces of anesthesia equipment; and (4) prior to performing further independent work at SMH, Dr. Wuchenich should undergo in service training with regard to the specific location of anesthesia-related equipment and resuscitation equipment in the operating room at SMH. Subsequently, on December 6, 1996, the Executive Committee offered to lift the suspension of Dr. Wuchenich's medical staff privileges if Dr. Wuchenich would submit his immediate resignation from the SMH Associate General Medical Staff.

8

On December 12, 1996, Dr. Wuchenich met with the Board of Appeals Committee who inquired regarding the circumstances of the cases in question. Then on January 28, 1997, SMH offered to reinstate Dr. Wuchenich's medical staff privileges without conditions in exchange for Dr. Wuchenich agreeing in writing to waive any claims against SMH, its employees, directors, or agents. Dr. Wuchenich refused; yet, on April 16, 1997, nearly one year after SMH suspended Dr. Wuchenich's medical staff privileges, SMH's Board of Director's passed a resolution voiding the suspension of Dr. Wuchenich.

On or about May 2, 1997, SMH purported to send information regarding the voided suspension to the National Practitioner's Data Bank but failed to properly address the envelope causing it to be returned and causing further delays in clearing Dr. Wuchenich's name. Subsequently, SMH sent the information to the correct address, but sent an improperly completed form. Therefore, the National Practioner's Data Bank returned the form to SMH for proper completion. Finally, on or about June 10, 1997, the National Practioner's Data Bank removed all mention of Dr. Wuchenich's suspension from its records, approximately one year after SMH suspended his medical staff privileges.

On May 21, 1998, following a detailed investigation, a hearing was conducted by the Informal Conference Committee of the Commonwealth of Virginia Board of Medicine to determine if the allegations against Dr. Wuchenich with respect to the four cases at issue were supported by evidence. After thoroughly reviewing the record, which included the transcript of the hearing before the Hearing Committee, the Informal Conference Committee voted to dismiss all charges against Dr. Wuchenich and instructed its staff to note on the notice of action that Dr. Wuchenich was completely exonerated of all wrongdoing.

The following sections of SMH's bylaws setting forth the procedures SMH should follow when considering the suspension of a physician's medical staff privileges are at issue in this case: SMH Bylaws §§ 6.1(a), (c)-(e) and 6.2(a). SMH Bylaws§ 6.1(a) states that once a case alleging professional misconduct has been reviewed by the Peer Review Committee, the Peer Review Committee should refer it to the Informal Review Committee in accordance with SMH Bylaws

9

§ 6.1(c). SMH Bylaws § 6.1(c) provides that "before curtailment or suspension of clinical privileges is implemented, the Executive Committee shall immediately appoint an ad hoc committee for a preliminary review of the matter (the Informal Review Committee)." (J.A. 17) (internal quotation marks omitted). SMH Bylaws§ 6.1(d) provides, inter alia, that prior to the Informal Review Committee making its report and recommendations for corrective action to the Executive Committee, "the practitioner against whom corrective action has been requested shall have an opportunity for an interview with the [Informal] Review Committee. At such interview, he/she shall be informed of the general nature of the charges against him/her, and shall be invited to discuss, explain or refute them." (J.A. 17) (internal quotation marks omitted). SMH Bylaws § 6.1(e) provides that upon receipt of a report and recommendation of the Informal Review Committee requesting reduction or suspension of clinical privileges, SMH's "President/CEO shall notify the affected practitioner that he/she shall be permitted to make an appearance before the Executive Committee prior to its taking action on such request." (J.A. 17-18) (internal quotation marks omitted). SMH Bylaws § 6.2(a) provides that a "Summary Suspension," i.e., suspension of medical staff privileges without following the procedures required in SMH Bylaws§ 6.1, "may only be imposed whenever action must be taken immediately, to protect the life of any patient or to reduce the substantial likelihood of immediate injury or damage to the health o[r] safety of any patient, employee, or other person present in SMH." (J.A. 18-19) (internal quotation marks omitted).

According to Dr. Wuchenich's complaint, SMH did not suspend Dr. Wuchenich's medical staff privileges pursuant to SMH Bylaws § 6.2(a). Therefore, under SMH's Bylaws, SMH was required to comply with the procedures set forth in SMH Bylaws§ 6.1 in suspending Dr. Wuchenich's medical staff privileges.**2** SMH failed to comply

_____

**2** We note that SMH argues in its brief and asserted at oral argument that liberally construing the factual allegations of Dr. Wuchenich's complaint reveals that it suspended Dr. Wuchenich's medical staff privileges pursuant to SMH Bylaws § 6.2(a). SMH Bylaws§ 6.2(a) allows for the summary suspension of a physician's medical staff privileges (i.e., suspension without prior notice to the physician or an opportunity to be heard) "whenever action must be taken immediately, to protect the life

10

with several of the procedures. First, SMH failed to appoint an Informal Review Committee prior to suspending Dr. Wuchenich's medical staff privileges as required by SMH Bylaws § 6.1(c). Second, SMH failed to allow Dr. Wuchenich the opportunity for an interview with the Informal Review Committee prior to suspending his medical staff privileges as required by SMH Bylaws § 6.1(d). Third, neither of SMH's Co-Chief Executive Officers notified Dr. Wuchenich that he was permitted to make an appearance before the Executive Committee prior to the Executive Committee suspending his medical staff privileges as required by SMH Bylaws § 6.1(e).

On June 1, 1998, Dr. Wuchenich filed a six-count complaint in the United States District Court for the Western District of Virginia based upon diversity jurisdiction. See 28 U.S.C.§ 1332. The complaint asserts claims alleging breach of contract by SMH; negligent breach of contract by SMH; statutory conspiracy to injure a person in his reputation, business or profession against SMH, Dr. Karmy, Dr. Ciochetty, and Dr. Phillips (collectively the Defendants); common law conspiracy to breach a contract against the Defendants; defamation against SMH, Dr. Karmy, and Dr. Phillips; and tortious interference with an existing contract and business expectancies against the Defendants. The complaint alleged that as a result of the actions complained about, Dr. Wuchenich suffered $1,121,000 in economic damages and

---

of any patient or to reduce the substantial likelihood of immediate injury or damage to health o[r] safety of any patient." (J.A. 19). In support of its assertion, SMH relies upon the following language found in its May 31, 1996 letter to Dr. Wuchenich, which is attached as Exhibit G to the complaint: "Based upon the results of the Peer Review, the Executive Committee of the General Medical Staff has recommended that your privileges be suspended at Shenandoah Memorial Hospital. Based upon this recommendation and the fact that the allegations pertain to matters that could endanger the safety and well-being of patients, the acting Chief Executive Officers have directed that you be removed from On Call status until further notice." (J.A. 49) (emphasis added). Liberally viewing this language in the light most favorable to Dr. Wuchenich reveals that SMH did not necessarily suspend Dr. Wuchenich's medical staff privileges pursuant to SMH Bylaws § 6.2(a). The language in SMH's letter is simply not as definitive as that required by SMH Bylaws § 6.2(a).

11

$500,000 in damages for emotional distress and loss of reputation. His complaint also sought punitive damages.

The Defendants timely filed Rule 12(b)(6) motions to dismiss. A magistrate judge considered the motions and reported and recommended dismissal of the claims alleging breach of contract, negligent breach of contract, and common law conspiracy to breach a contract. However, the magistrate judge recommended refusing dismissal with respect to the claims alleging statutory conspiracy to injure a person in his reputation, business, trade or profession and tortious interference with an existing contract and business expectancies. With respect to the claim alleging defamation, the magistrate judge granted Dr. Wuchenich ten days to supplement and amend his complaint to state the precise words of the alleged defamation, but Dr. Wuchenich elected not to do so.

On January 29, 1999, in a memorandum opinion, the district court adopted the magistrate judge's report and recommendations with respect to the claims alleging breach of contract, negligent breach of contract, and common law conspiracy to breach a contract. The district court, however, declined to adopt the magistrate judge's recommendations with respect to the claims alleging statutory conspiracy to injure a person in his reputation, business, trade or profession and tortious interference with an existing contract and business expectancies. Thus, the district court dismissed those claims as well. The district court also dismissed the claim alleging defamation. Thus, the district court dismissed all counts of Dr. Wuchenich's complaint pursuant to Rule 12(b)(6).

On February 12, 1999, Dr. Wuchenich made a motion for reconsideration, which the district court denied on March 24, 1999. This timely appeal followed. On appeal, Dr. Wuchenich challenges the district court's dismissal of all of his claims.

II

Dr. Wuchenich first contends the district court erred in granting the Defendants' Rule 12(b)(6) motion with respect to his breach of contract claim. In that claim, Dr. Wuchenich alleges, inter alia: (1) SMH violated SMH Bylaws § 6.1(c) by failing to appoint an Informal

12

Review Committee prior to suspending his medical staff privileges; (2) SMH violated SMH Bylaws § 6.1(d) by failing to allow him the opportunity for an interview with the Informal Review Committee to discuss, explain or refute the allegations against him prior to suspending his medical staff privileges; and (3) SMH violated SMH Bylaws § 6.1(e) when neither of SMH's Co-Chief Executive Officers notified Dr. Wuchenich that he was permitted to make an appearance before the Executive Committee prior to the Executive Committee suspending his medical staff privileges. In a somewhat different vein, Dr. Wuchenich alleges that SMH breached its oral assurances made before and after the execution of the Physician Guarantee Agreement that it would assign him an adequate number of patients to assure his ability to establish his practice within the Woodstock, Virginia area.

We agree with Dr. Wuchenich that he has stated a breach of contract claim against SMH with respect to SMH's Bylaws. However, we disagree with Dr. Wuchenich that he has stated a claim for breach of SMH's alleged oral assurances.

Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; "importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). Rather, a Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief. See id. For purposes of a Rule 12(b)(6) motion, we are not required to accept as true the legal conclusions set forth in a plaintiff's complaint. See District 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp., 609 F.2d 1083, 1085 (4th Cir. 1979).

A. SMH's Alleged Breach of its Bylaws.

The parties agree that the law of Virginia controls all substantive legal issues in this case. Under Virginia law, "[t]he essential elements of a cause of action for breach of contract are: (1) a legal obligation

13

of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to the plaintiff." Westminster Investing Corp. v. Lamps Unlimited, Inc. , 379 S.E.2d 316, 317 (Va. 1989) (internal quotation marks and footnote omitted).

Dr. Wuchenich first argues that the following language constituting Article I in the Physician Guarantee Agreement expressly incorporated SMH's Bylaws as binding obligations on both himself and SMH:

> [Dr. Wuchenich], in consideration of the covenants and agreements made by [SMH] contained herein, covenants and agrees to practice medicine in the specialty of <u>Anesthesia</u> at [SMH] and upon the effective date hereof to immediately apply, become upon commencement of this medical practice at [SMH] and remain continuously during the term of this Agreement, a member of [SMH's] Active Medical Staff <u>as defined in its Medical Staff Bylaws subject, however, to said Bylaws.</u>

(J.A. 34-35) (emphasis added). Alternatively, Dr. Wuchenich argues that because SMH made his medical staff privileges subject to and governed by its bylaws, SMH had a corresponding obligation implied by law to abide by its bylaws in any attempt to suspend or revoke his medical staff privileges. The merger clause in the Physician Guarantee Agreement, Dr. Wuchenich contends, does not preclude him from alleging the existence of such an implied legal obligation because an exception to the parol evidence rule known as the collateral contract doctrine applies.

SMH vigorously denies that by agreeing to the terms of Article I of the Physician Guarantee Agreement it intended to be legally obligated to Dr. Wuchenich to follow its bylaws in suspending his medical staff privileges. Furthermore, SMH argues that the merger clause in the Physician Guarantee Agreement precludes Dr. Wuchenich from relying upon parol evidence to establish such an obligation. Finally, SMH argues that even if we determine that it had an obligation (under the Physician Guarantee Agreement or implied by law) to follow its bylaws in suspending Dr. Wuchenich's medical staff privileges, the

14

facts as alleged in the complaint establish that it fully complied with its bylaws in suspending Dr. Wuchenich's medical staff privileges.

In our review of the district court's decision to dismiss Dr. Wuchenich's breach of contract claim alleging SMH breached its bylaws in suspending Dr. Wuchenich's medical staff privileges, we are guided by the following principles:

> If the terms of the parties' agreement are contained in a clear explicit writing, that writing is the sole memorial of the contract and the sole evidence of the agreement. In that event, . . . parol evidence . . . could not be used to explain the written contractual terms.
>
> Conversely, the rule excluding parol evidence has no application where the writing on its face is ambiguous, vague, or indefinite. In such a case, the proper construction of the contract is an issue for the trier of fact, and the court should receive extrinsic evidence to ascertain the intention of the parties and to establish the real contract between them.

Cascades N. Venture v. PRC, Inc., 457 S.E.2d 370, 373 (Va. 1995) (internal citations omitted). The language of a written contract is ambiguous if it is reasonably susceptible to more than one interpretation or makes reference to two or more things at the same time. See Tuomala v. Regent Univ., 477 S.E.2d 501, 505 (Va. 1996). "The question of whether a writing is ambiguous is one of law, not of fact." Id. at 505.

Below, the district court concluded that the language contained in Article I "cannot be construed under a fair reading as giving rise to an incorporation by reference of the provision of the Bylaws as provisions of the contract binding on SMH as well as plaintiff." (J.A. 158). We disagree with this conclusion. In our view, the language contained in Article I referring to SMH's Bylaws (i.e., "subject . . . to said Bylaws," (J.A. 35)), is reasonably susceptible to two interpretations, and is, therefore, ambiguous. One reasonable interpretation is that only Dr. Wuchenich was obligated to abide by SMH's Bylaws. The other is that both Dr. Wuchenich and SMH had a legal obligation in

15

favor of each other to abide by SMH's Bylaws. In this regard, the trier of fact could reasonably construe the language "subject . . . to said Bylaws," id., as implying that SMH intended to follow its bylaws with respect to its conduct toward Dr. Wuchenich.

Given our conclusion that the terms of the Physician Guarantee Agreement are ambiguous regarding whether SMH had a legal obligation to abide by its bylaws with respect to its conduct toward Dr. Wuchenich, the merger clause does not bar Dr. Wuchenich from offering parol evidence to establish that he and SMH intended such an obligation to exist on the part of SMH at the time they executed the Physician Guarantee Agreement. In light of this conclusion, we need not and do not address Dr. Wuchenich's alternative argument that SMH has an obligation implied by law to abide by its bylaws with respect to Dr. Wuchenich.

We next address SMH's argument that in any event, it fully complied with its bylaws in suspending Dr. Wuchenich's medical staff privileges. Specifically, SMH asserts the facts as alleged in the complaint and contained in Exhibit H to the complaint establish that it gave Dr. Wuchenich sufficient notice to appear before the Peer Review Committee at its regularly scheduled meeting on May 28, 1996. In this regard, SMH is referring to Dr. Wuchenich's allegation in the complaint that a regularly scheduled Peer Review Committee meeting was held on or about May 28, 1996, and to the following statements in Exhibit H to the complaint: (1) "Cases 2 and 4 were placed in Dr. Wuchenich's mailbox for review on May 22, 1996," (J.A. 57); and (2) "Case 3 was placed in Dr. Wuchenich's mailbox for review on May 22, 1996," (J.A. 58).**3** SMH argues that, collectively, the allegation about the meeting on May 28, 1996, and these statements contained in Exhibit H conclusively establish that Dr. Wuchenich received sufficient notice to appear in his defense before the Peer Review Committee on May 28, 1996.

_____

**3** Exhibit H is the Written Statement of the Executive Committee, issued on December 6, 1996, regarding the professional misconduct charges against Dr. Wuchenich. The Written Statement of the Executive Committee contains a sequence of events that the Executive Committee opines demonstrate that SMH took the charges against Dr. Wuchenich very seriously and adhered to its bylaws throughout the review process.

16

We disagree. First, the complaint in no way incorporates by reference, as factual allegations of the complaint, the statements in Exhibit H relied upon by SMH. Indeed, as is clear from simply reading the complaint, the complaint only includes Exhibit H as an attachment for the limited purpose of providing direct support for the allegation that "on December 6, 1996, the [Executive Committee] offered to lift the Summary Suspension of Dr. Wuchenich's privileges if Dr. Wuchenich would `submit his immediate resignation from the Shenandoah Memorial Hospital Associate General Medical Staff.'" (J.A. 21) (quoting Ex. H at p. 6). Alternatively, even considering, for purposes of argument, that the statements in Exhibit H at issue are factual allegations of the complaint, they do not allege sufficient notice to Dr. Wuchenich to appear before the Peer Review Committee on May 28, 1996, even when coupled with the allegation that"[o]n or about May 28, 1996, at a regularly scheduled Peer Review Committee meeting four cases in which Dr. Wuchenich was involved were reviewed," (J.A. 16). Critically, nothing in this combination of allegations suggests that SMH alerted Dr. Wuchenich that it would be reviewing his four cases at the regularly scheduled Peer Review Committee meeting on May 28, 1996.**4**

In sum, we hold the complaint sufficiently alleges that SMH owed Dr. Wuchenich the legal obligation to follow its bylaws, SMH breached that obligation, and Dr. Wuchenich suffered damages as a result. Thus, the district court erred by dismissing Dr. Wuchenich's breach of contract claim alleging breach of SMH's Bylaws. We, therefore, vacate the district court's dismissal of this portion of Dr.

_____

**4** SMH also argues that the following statement in Exhibit H shows that it gave Dr. Wuchenich sufficient notice under its bylaws to appear before the Executive Committee: "Attempts to reach Dr. Wuchenich on Thursday, May 30, 1996 to inform him of the pending [Executive Committee meeting] at which time Dr. Wuchenich would have been invited to attend were further explained. All attempts were unsuccessful and messages left had no response." (J.A. 59). SMH's argument is without merit, because, as we have already explained, these statements are not incorporated as allegations in the complaint. Furthermore, assuming arguendo they are, viewing them in the light most favorable to Dr. Wuchenich, they do not establish that SMH gave Dr. Wuchenich sufficient notice under its bylaws to appear before the Executive Committee to defend himself.

Wuchenich's breach of contract claim and remand for further proceedings.

B. Oral Assurances Regarding Assigning Patients.

We next consider Dr. Wuchenich's challenge to the district court's dismissal of the portion of his breach of contract claim attempting to enforce oral assurances on the part of SMH made prior and subsequent to execution of the Physician Guarantee Agreement to the effect that it would assign him a sufficient volume of patients to establish a full-time practice in the Woodstock, Virginia area. Applying Virginia substantive law, we uphold the district court's dismissal as it relates to these alleged oral assurances.

The parol evidence rule is a basic principle of contract law providing that parol evidence is not admissible if offered to vary or contradict the terms of a complete and unambiguous written instrument. See Amos v. Coffey, 320 S.E.2d 335, 337 (Va. 1984). Under Virginia law, the parol evidence rule is not applicable if either the partial integration doctrine or the collateral contract doctrine is applicable. See Jim Carpenter Co. v. Potts, 495 S.E.2d 828, 833 (Va. 1998). Under the partial integration doctrine "[w]here the entire agreement has not been reduced to writing, parol evidence is admissible, not to contradict or vary its terms but to show additional independent facts contemporaneously agreed upon, in order to establish the entire contract between the parties." Renner Plumbing, Heating & Air Conditioning, Inc. v. Renner, 303 S.E.2d 894, 898 (Va. 1983) (internal quotation marks omitted). Under the collateral contract doctrine, parol evidence is admissible to establish a "prior or contemporaneous oral agreement that is independent of, collateral to and not inconsistent with the written contract, and which would not ordinarily be expected to be embodied in the writing." Jim Carpenter Co. , 495 S.E.2d at 833 (internal quotation marks omitted).

The language of the Physician Guarantee Agreement makes clear that its purpose was to assist Dr. Wuchenich in establishing an anesthesiology practice in the Woodstock, Virginia area. The merger clause states that the Physician Guarantee Agreement is the entire agreement between the parties. Thus, to the extent the Physician Guarantee Agreement addresses efforts on the part of SMH to assist

18

Dr. Wuchenich in establishing an anesthesiology practice in the Woodstock, Virginia area, it represents the entire agreement between the parties.

Under the parol evidence rule, Dr. Wuchenich cannot introduce evidence that prior to execution of the Physician Guarantee Agreement, SMH assured him of a sufficient patient volume to establish an anesthesiology practice in the Woodstock, Virginia area, because to do so would clearly contradict the unambiguous language of the Physician Guarantee Agreement limiting SMH's obligation to assist Dr. Wuchenich in establishing his anesthesiology practice to providing him a salary guarantee under the terms specified. See Amos, 320 S.E.2d at 337. Hand in glove with this conclusion is the conclusion that the partial integration doctrine is not applicable here given the fact that the Physician Guarantee Agreement is a complete integration of the parties' agreement with respect to SMH's obligations to assist Dr. Wuchenich in establishing his anesthesiology practice. See Renner Plumbing, 303 S.E.2d at 898. Furthermore, because assurances by a hospital to assign a new physician a sufficient number of patients to establish a practice in the area in which the hospital is located would ordinarily be expected to be included in an agreement between the physician and the hospital whereby the hospital guarantees the physician a salary for a specified period of time, the collateral contract doctrine is also inapplicable. See Jim Carpenter Co., 495 S.E.2d at 833.

Finally, to the extent Dr. Wuchenich alleges an oral modification of the Physician Guarantee Agreement with respect to SMH's oral assurances of patient volume allegedly made subsequent to execution of the Physician Guarantee Agreement, his argument is foreclosed by Virginia case law requiring a mutual intention to modify the existing contract. See Cardinal Dev. v. Stanley Const. Co., 497 S.E.2d 847, 850-51 (Va. 1998). Even viewing the allegations in the complaint in the light most favorable to Dr. Wuchenich, one cannot reasonably conclude that SMH intended to modify any terms of the Physician Guarantee Agreement.

For these reasons, we affirm the district court's dismissal of the portion of Dr. Wuchenich's breach of contract claim seeking to enforce oral assurances allegedly made by SMH to assign him a suffi-

19

cient volume of patients to establish an anesthesiology practice in the Woodstock, Virginia area.**5**

III

Dr. Wuchenich next challenges the district court's dismissal of his claim alleging the Defendants committed civil conspiracy in violation of Virginia Code § 18.2-499 to 500 by conspiring to injure him in his reputation, business, trade and profession. Before addressing the merits of Dr. Wuchenich's challenge, it is necessary to set forth the terms of Virginia's civil conspiracy statute and the relevant case law.

Virginia's civil conspiracy statute states, in pertinent part, that "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of . .. willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever" shall be liable civilly for treble damages. Va. Code Ann. § 18.2-499 to 500 (Michie 1996). The Virginia Supreme Court has made clear that this statute does not require proof that a conspirator's primary and overriding purpose is to injure another in his reputation, business, trade or profession. See Commercial Bus. Sys., Inc. v. BellSouth Servs. Inc., 453 S.E.2d 261, 267 (Va. 1995). Instead, only legal malice is required, i.e., proof that the defendant acted intentionally, purposely, and without lawful justification. See id.

Furthermore, the "two or more persons" requirement is not satisfied

_____

**5** Dr. Wuchenich also contends the district court erred in dismissing his claim alleging negligent breach of contract, which claim he admits in his Reply Brief is identical in substance to his claim alleging breach of contract. Because Dr. Wuchenich's claim alleging negligent breach of contract is duplicative of his claim alleging breach of contract, and because Virginia substantive law does not recognize a tort cause of action based solely on the negligent breach of a contractual duty with no corresponding common law duty, we hold the district court properly dismissed Dr. Wuchenich's claim alleging negligent breach of contract. See Foreign Mission Bd. v. Wade, 409 S.E.2d 144, 148 (Va. 1991) (rejecting plaintiff's attempt to establish a tort action based solely on the negligent breach of a contractual duty with no corresponding common law duty).

by proof that a principal conspired with one of its agents acting within the scope of his agency. See Charles E. Brauer Co. v. Nationsbank, 466 S.E.2d 382, 386-87 (Va. 1996); Fox v. Deese , 362 S.E.2d 699, 708 (Va. 1987). Under such a circumstance, a conspiracy is a legal impossibility because a principal and an agent are not separate persons for purposes of the conspiracy statute. See id.

Virginia has thus far not recognized an exception to the general rule that a principal cannot conspire with one of its agents to form a conspiracy, a rule sometimes referred to as the intracorporate immunity rule. However, in Greenville Publ'g Co. v. Daily Reflector, Inc., 496 F.2d 391 (4th Cir. 1974), we observed that an exception to the general rule "may be justified when the officer has an independent personal stake in achieving the corporation's illegal objective." Id. at 399. In that case, we held that the president of the defendant company could conspire with it for purposes of an antitrust claim under the Sherman Act, see 15 U.S.C. § 1, where he had a financial interest in another company that competed with the plaintiff company and he would directly benefit if the plaintiff company was eliminated as a competitor. See id. at 400.

In an en banc case seventeen years later, we revisited the personal stake exception in a case somewhat similar to the facts in the case before us. See Oksanen v. Page Mem'l Hosp., 945 F.2d 696 (4th Cir. 1991) (en banc). In Oksanen, a physician brought an antitrust claim under the Sherman Act against a hospital and several other physicians who were members of its medical staff as a result of his medical staff privileges being revoked. See id. at 702. The plaintiff physician alleged that the hospital and the other physicians violated the Sherman Act by conspiring to revoke his medical staff privileges. See id. The hospital and the other physicians argued that they were legally incapable of conspiring. See id. The plaintiff physician argued in response that the personal stake exception applied. See id. at 702-03.

We held that under the circumstances of that case, the exception did not apply. First, we recognized that only one of the individual defendants stood to directly gain from the revocation of the plaintiff physician's medical staff privileges. See id. at 705. That physician was the only defendant physician who could be said to have been in

21

competition with the plaintiff physician. See id. We explained that in any event, the

> more important aspect of Greenville for the purposes of peer review is the degree of control the officer or agent with the independent interest exercised over the defendant firm's decision making process. If the officer cannot cause a restraint to be imposed and his firm would have taken the action anyway, then any independent interest is largely irrelevant to the antitrust analysis.

Id. (emphasis added). In Oksanen, the hospital board retained authority in the end over staff privilege decisions. See id. at 705-06. Because revocation of the plaintiff physician's medical staff privileges was subject to review by the hospital, and because decision making authority in the plaintiff physician's case was dispersed among a number of individuals, we held the personal stake exception did not apply. See id. at 706.

Liberally construed, Dr. Wuchenich's complaint alleges that Drs. Phillips, Ciochetty, and Karmy, on the one hand and SMH on the other hand conspired to injure Dr. Wuchenich in his reputation, business, trade, and profession by: (1) Dr. Phillips and Dr. Ciochetty failing to assign Dr. Wuchenich a fair share of the patient load; (2) Dr. Karmy instigating peer review of two of Dr. Wuchenich's cases without just cause; and (3) SMH suspending Dr. Wuchenich's medical staff privileges without just cause. Initially, the rule that a principal cannot conspire with one of its agents appears to resolve this claim in favor of the Defendants. Clearly, the actions of the individual physicians of which Dr. Wuchenich complains fell within the scope of their agency authority from SMH. Thus, the question arises as to whether the personal stake exception applies.[6]

Our careful review of the allegations in the complaint reveals that the exception applies in part. The personal stake exception does not

_____

[6] The Defendants do not dispute that under the appropriate set of facts, Virginia law would recognize the applicability of the personal stake exception to the intracorporate immunity rule as developed by our court with respect to the Sherman Act.

22

apply to the extent Dr. Wuchenich alleges a conspiracy to suspend his medical staff privileges, including Dr. Karmy's action in recommending that two of Dr. Wuchenich's cases be subject to peer review. This is because the facts alleged in Dr. Wuchenich's complaint parallel the facts of <u>Oksanen</u>: SMH's Board of Directors, its governing body, retained decision making authority over decisions involving medical staff privileges and review was disbursed among various committees that did not include the defendant physicians. <u>See id.</u> at 705-06. The personal stake exception does apply, however, to the allegation that SMH conspired with Dr. Phillips and Dr. Ciochetty to injure Dr. Wuchenich in his reputation, business, trade and profession by failing to assign Dr. Wuchenich a fair number of patients. Dr. Wuchenich's complaint plainly alleges that in so doing these physicians were acting for their own independent financial benefit by reducing direct competition. Therefore, we affirm the district court's dismissal of Dr. Wuchenich's claim alleging civil statutory conspiracy against the Defendants except to the extent it alleges a conspiracy by SMH, Dr. Phillips, and Dr. Ciochetty to injure Dr. Wuchenich in his reputation and to injure his ability to engage in his business, trade, and profession by failing to assign him a fair number of patients. On that point, we vacate the district court's dismissal and remand for further proceedings.

IV

Next, Dr. Wuchenich contends the district court erred in dismissing his claim against the Defendants alleging common law conspiracy to breach contractual obligations.

Applying Virginia substantive law, we hold the district court acted properly in dismissing Dr. Wuchenich's claim alleging common law conspiracy to breach contractual obligations. Virginia "common law recognizes a cause of action against those who conspire to induce the breach of a contract, even when one of the alleged conspirators is a party to the contract." <u>Catercorp, Inc. v. Catering Concepts, Inc.</u>, 431 S.E.2d 277, 281 (Va. 1993). The "foundation" of an action alleging common law conspiracy "is the damage caused by the acts committed in furtherance of the conspiracy." <u>Commercial Bus. Sys., Inc.</u>, 453 S.E.2d at 267.

23

Here, the only contractual obligation that Dr. Wuchenich sufficiently alleges SMH breached is the obligation to abide by its bylaws in suspending his medical staff privileges. Thus, we must consider whether the allegations in the complaint sufficiently allege a cause of action with respect to each defendant for common law conspiracy to cause SMH to breach its bylaws with respect to suspending Dr. Wuchenich's medical staff privileges.

The complaint does not allege that Dr. Phillips or Dr. Ciochetty had any hand in any of the proceedings leading to the suspension of Dr. Wuchenich's medical staff privileges; indeed, the allegations in the complaint suggest no involvement. With respect to Dr. Phillips, the complaint alleges that he was "[u]nexpectedly . . . forced to resign his medical staff privileges at SMH on or about April 15, 1996," (J.A. 15), which is a month and a half before the first meeting in the review process took place on May 28, 1996. With respect to Dr. Ciochetty, the complaint alleges that even though Dr. Ciochetty was Chief of Anesthesiology, he was not interviewed by the Peer Review Committee or asked to give an opinion before the Peer Review Committee regarding Dr. Wuchenich's cases. In sum, the complaint fails to allege sufficient facts, viewed in the light most favorable to Dr. Wuchenich, from which a reasonable jury could find that Dr. Phillips or Dr. Ciochetty conspired with any other defendant to cause SMH to breach its contractual obligation to Dr. Wuchenich to abide by its bylaws.

The only allegation pertaining to Dr. Karmy and the proceedings leading to Dr. Wuchenich's suspension is that Dr. Karmy instigated, without just cause, two of the four cases reviewed by the Peer Review Committee. We are at a loss to see how this allegation supports a claim for conspiracy to cause SMH to breach its obligation to Dr. Wuchenich to abide by the procedural protections in its bylaws in suspending Dr. Wuchenich's medical staff privileges. Finally, without a party with whom to conspire, Dr. Wuchenich's claim alleging common law conspiracy against SMH necessarily fails. In sum, we affirm the district court's dismissal of Dr. Wuchenich's claim alleging common law conspiracy to breach contractual obligations.[7]

_____

[7] Given our reasons for affirming the district court's dismissal of this claim, we need not address the Defendants' alternative argument that the claim fails under the general rule that a principal cannot legally conspire with its agents.

24

V

Dr. Wuchenich next challenges the district court's dismissal of his claim against SMH, Dr. Karmy, and Dr. Phillips alleging common law defamation.

The district court dismissed Dr. Wuchenich's defamation claim because, according to the district court, Dr. Wuchenich failed to plead the "exact words allegedly defaming plaintiff, or the precise occasions on which those statements were made, or to whom they were made." (J.A. 166). In so doing, the district court relied upon Federal Land Bank v. Birchfield, 3 S.E.2d 405 (Va. 1939), which requires a plaintiff asserting a defamation claim in Virginia state court to plead the exact words that the plaintiff alleges are defamatory in order to survive a motion to dismiss. See id. at 410.

The district court's analysis is erroneous because the sufficiency of Dr. Wuchenich's complaint to properly state a claim for relief should be tested under Federal Rule of Civil Procedure 8 (Rule 8), which specifies the general rules of pleading in federal court. See Hanna v. Plumer, 380 U.S. 460, 465 (1965) (holding that federal courts sitting in diversity must apply state substantive law and federal procedural law). Rule 8 does not contain a special pleading requirement for defamation. Thus, according to Rule 8(a), we should test the sufficiency of Dr. Wuchenich's claim alleging defamation to determine whether it meets Rule 8(a)'s liberal pleading requirement of a short and plain statement showing that he is entitled to relief. See 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Civil 2d § 1245 (1990).

In general, defamation consists of the publication of an injurious falsehood. See Gazette, Inc. v. Harris, 325 S.E.2d 713, 724-25 (Va. 1985). Unlike other jurisdictions, Virginia makes no distinction between slander (spoken words) and libel (written words) in actions for common law defamation. See Fleming v. Moore , 275 S.E.2d 632, 635 (Va. 1981). Virginia recognizes two general varieties of defamation: (1) words that are defamatory per se; and (2) all other defamatory words which, though not in themselves actionable, occasion a person special damage. See Wells v. Liddy, 186 F.3d 505, 522 (4th Cir. 1999), cert. denied, 120 S. Ct. 939 (2000). Words that are defam-

25

atory per se are words that: (1) impute the commission of a criminal offense involving moral turpitude; (2) impute infection of a contagious disease, where if true, would exclude the plaintiff from society; (3) impute unfitness to perform the offices or duties of employment, or lack of integrity in the discharge of those duties; or, (4) prejudice a person in his or her profession or trade. See id. Furthermore, "the author or originator of a defamation is liable for a republication or repetition thereof by third persons, provided it is the natural and probable consequence of his act, or he has presumptively or actually authorized or directed its republication." Weaver v. Beneficial Fin. Co., 98 S.E.2d 687, 690 (Va. 1957); see also Blue Ridge Bank v. Veri-banc, Inc., 866 F.2d 681, 689 (4th Cir. 1989).

Effective July 1, 1995, a cause of action for defamation under Virginia law has been governed by a one-year statute of limitation prescribed by Virginia Code § 8.01-247.1. See Va. Code Ann. § 8.01-247.1 (Michie 1999 Supp.). A cause of action for defamation accrues for statute of limitation purposes on the date the defamatory acts allegedly occurred. See Jordan v. Shands, 500 S.E.2d 215, 218 (Va. 1998).

Construing the allegations in the complaint in the light most favorable to Dr. Wuchenich, and drawing all reasonable inferences in his favor, Dr. Wuchenich's defamation claim seeks redress for the following alleged conduct: (1) Dr. Phillips falsely stating to Dr. Baumunk and all surgeons practicing at SMH, at some point in time prior to April 6, 1996, that Dr. Wuchenich "was not a very good anesthesiologist," (J.A. 13), and that he was less than competent; (2) Dr. Karmy instigating two peer review cases of Dr. Wuchenich by falsely reporting, at some point in time prior to May 28, 1996, that Dr. Wuchenich did not meet the standard of care with respect to two patients; (3) SMH falsely reporting on May 31, 1996, to various persons, including staff members and administrators of SMH, that Dr. Wuchenich is not competent to practice anesthesiology; (4) SMH reporting shortly after May 31, 1996, to the State Board of Medicine, which in turn reported to the National Practioner Data Bank, that it (SMH) suspended Dr. Wuchenich's medical staff privileges for lack of professional competence; (5) SMH continuing to publish the false statement that Dr. Wuchenich is professionally incompetent in hearings held by SMH after SMH suspended Dr. Wuchenich's medical staff

26

privileges, the last of which occurred on December 12, 1996; (6) SMH publishing the false statement that Dr. Wuchenich is professionally incompetent through conversations within SMH and the community at large and through written correspondence with its staff and administrators until SMH reinstated his medical staff privileges on April 16, 1997; (7) SMH knowingly allowing the National Practioner Data Bank to continue to report until June 10, 1997 that SMH had suspended Dr. Wuchenich for professional incompetence; and (8) SMH publishing the false statement that Dr. Wuchenich is professionally incompetent during the post June 1, 1997 portion of the State Board of Medicine's investigation of the allegations that lead to the suspension of Dr. Wuchenich's medical staff privileges at SMH. We conclude that all of the alleged conduct just listed constitutes defamation per se, because each statement, whether oral or written, falsely imputed unfitness on the part of Dr. Wuchenich to perform his duties as an anesthesiologist and prejudiced him in his profession. See Wells, 186 F.3d at 522. Furthermore, each statement was either published originally by the specified defendant or was republished by a third party as the natural and probable consequence of the specified defendant's original publication. See Weaver, 98 S.E.2d at 690.

We now consider whether each of these instances of defamatory conduct is actionable under Virginia's one-year statute of limitation for defamation claims.[8] Our review of each of these instances of defamatory conduct leads us to conclude that only two are alleged to have occurred within one year of the filing of Dr. Wuchenich's complaint on June 1, 1998: (1) the ongoing publication (knowingly allowed and expected by SMH) in the National Practitioner's Data Bank that SMH had suspended Dr. Wuchenich's medical staff privileges for professional incompetency; and (2) SMH publishing the false statement that Dr. Wuchenich is professionally incompetent during the post June 1, 1997 portion of the Board of Medicine's investigation of the allegations that lead to the suspension of Dr. Wuchenich's medical staff privileges at SMH. According to SMH, Virginia Code § 54.1-2906(C) provides it with immunity from suit with respect to both of these instances of alleged defamatory conduct. Virginia Code § 54.1-2906(C) provides any person immunity from

---

[8] SMH, Dr. Karmy, and Dr. Phillips raised the statute of limitations defense below in support of their Rule 12(b)(6) motions.

civil liability for making a report to the State Board of Medicine regarding disciplinary action resulting from professional incompetence or testifying in a judicial or administrative proceeding as a result of such a report unless such person acted in bad faith or with malicious intent. See Va. Code Ann.§ 54.1-2906(C) (Michie 1998). Assuming arguendo that § 54.1-2906(C) would otherwise provide SMH with immunity from suit with respect to the two instances of defamatory conduct on its part not barred by the statute of limitations, we conclude it does not provide SMH with immunity at the early dismissal stage of litigation because the complaint clearly alleges that SMH engaged in the defamatory conduct in bad faith and with malicious intent.

In sum, we hold the district court properly dismissed all portions of Dr. Wuchenich's claim alleging defamation except for the portion seeking redress against SMH for the ongoing publication (knowingly allowed and expected by SMH) in the National Practitioner's Data Bank that SMH had suspended Dr. Wuchenich's medical staff privileges for professional incompetency, and for SMH's publication of the false statement that Dr. Wuchenich is professionally incompetent during the post June 1, 1997 portion of the Board of Medicine's investigation of the allegations that lead to the suspension of Dr. Wuchenich's medical staff privileges at SMH. We, accordingly, vacate the district court's dismissal of these specified allegations, remand them for further proceedings, and affirm the district court's dismissal of the balance.

VI

Dr. Wuchenich lastly challenges the district court's dismissal of his claims alleging tortious interference with an existing contract and tortious interference with his business expectancies. Liberally construed, the complaint alleges that the actions and statements of the Defendants tortiously interfered with SMH's Bylaws as contractual provisions of the Physicians Guarantee Agreement and as an implied contract between Dr. Wuchenich and SMH. Furthermore, the complaint alleges that the Defendants tortiously interfered with Dr. Wuchenich's business expectancy of continued referrals of patients for his care and treatment from SMH and the physicians who had medical staff privileges at SMH.

28

Under Virginia law, a cause of action for tortious interference by a third party with a contract that is not terminable at will, such as the Physician Guarantee Agreement, is comprised of the following elements: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." Duggin v. Adams, 360 S.E.2d 832, 835 (Va. 1987) (internal quotation marks omitted). If the contract at issue is terminable at will, the plaintiff must also allege and prove that the defendant interfered with the contract by employing improper methods. See id. at 836.

Under Virginia law, a cause of action for tortious interference with a contractual or business expectancy is comprised of the following elements: (1) the existence of a contractual or business expectancy, (2) knowledge on the part of the third-party of the expectancy; (3) intentional interference with the expectancy; (4) the third-party's use of improper methods to interfere with the expectancy; and (5) damage to the party making the claim proximately resulting from the third-party's conduct. See Maximus, Inc. v. Lockheed Info. Management Sys. Co., 493 S.E.2d 375, 378 (Va. 1997). Independently tortious conduct (i.e., conduct that in and of itself would be an actionable tort) is recognized under Virginia law as an improper method. See Duggin, 360 S.E.2d at 836. But, independently tortious conduct is but one species of improper methods. As the Virginia Supreme Court in Maximus explained, actions may also be improper which are neither independently tortious nor illegal, for example, unfair competition and unethical conduct. See Maximus, 493 S.E.2d at 379. Finally, we note that while a person cannot intentionally interfere with his own contract, if it can be shown that an agent of a party to the contract was acting outside the scope of his employment in tortiously interfering with such contract, then the aggrieved party may be entitled to recover in the event the agent is unable to establish an affirmative defense of justification or privilege. See Fox, 362 S.E.2d at 708.

The district court properly dismissed the causes of action against SMH for tortious interference with the Physician Guarantee Agreement and any implied agreement between SMH and Dr. Wuchenich

29

to abide by SMH's Bylaws, because SMH, as a party to both the Physician Guarantee Agreement and any such implied contract, cannot intentionally interfere with its own contract. See Fox, 362 S.E.2d at 708. The district court also properly dismissed these same causes of action against Dr. Karmy, Dr. Ciochetty, and Dr. Phillips, because none of their conduct (failing to assign Dr. Wuchenich patients and referring two cases of Dr. Wuchenich for peer review without just cause) could be reasonably considered as having interfered with the procedural protections of SMH's Bylaws.

We do, however, conclude that Dr. Wuchenich has sufficiently stated a cause of action at this early pleading stage against the Defendants for tortious interference with his expectancy of entering into contractual relationships with some patients at SMH. In this regard, Dr. Wuchenich has alleged the existence of the contractual expectancy, knowledge on the part of each defendant of the expectancy, and intentional interference with the expectancy by unfair competition (i.e., Dr. Phillips and Dr. Ciochetty failing to assign Dr. Wuchenich a fair share of anesthesiology patients) and unethical conduct (i.e., SMH suspending Dr. Wuchenich's medical staff privileges without just cause and Dr. Karmy reporting two cases of Dr. Wuchenich to peer review without just cause) proximately resulting in damage to Dr. Wuchenich. See Maximus, 493 S.E.2d at 378.

In sum, we affirm the district court's dismissal of Dr. Wuchenich's tortious interference claims pertaining to SMH's Bylaws. However, we vacate the district court's dismissal of his contractual expectancy claim against the Defendants and remand that claim for further proceedings.

VII

In conclusion, we: (1) vacate the district court's dismissal of Dr. Wuchenich's claim alleging breach of SMH's Bylaws; (2) affirm the district court's dismissal of the portion of Dr. Wuchenich's breach of contract claim seeking to enforce oral assurances allegedly made by SMH to assign him a sufficient number of patients to establish an anesthesiology practice in the Woodstock, Virginia area; (3) affirm the district court's dismissal of Dr. Wuchenich's claim alleging negligent breach of contract; (4) affirm the district court's dismissal of Dr.

30

Wuchenich's claim alleging civil conspiracy except to the extent it alleges a conspiracy among SMH, Dr. Phillips, and Dr. Ciochetty to injure Dr. Wuchenich's ability to engage in the practice of his profession by failing to assign him a fair number of patients; (5) vacate the district court's dismissal of Dr. Wuchenich's claim alleging civil conspiracy to the extent it alleges a conspiracy among SMH, Dr. Phillips, and Dr. Ciochetty to injure Dr. Wuchenich's ability to engage in the practice of his profession by failing to assign him a fair number of patients; (6) affirm the district court's dismissal of Dr. Wuchenich's claim alleging common law conspiracy to breach contractual obligations; (7) affirm the district court's dismissal of Dr. Wuchenich's claim alleging defamation except for the portion seeking redress against SMH for the ongoing publication (knowingly allowed and expected by SMH) in the National Practitioner's Data Bank that SMH had suspended Dr. Wuchenich's medical staff privileges for professional incompetency, and for SMH's publishing the false statement that Dr. Wuchenich is professionally incompetent during the post June 1, 1997 portion of the Board of Medicine's investigation of the allegations that lead to the suspension of Dr. Wuchenich's medical staff privileges at SMH; (8) vacate the portion of the district court's dismissal of Dr. Wuchenich's defamation claim seeking redress against SMH for the ongoing publication (knowingly allowed and expected by SMH) in the National Practitioner's Data Bank that SMH had suspended Dr. Wuchenich's medical staff privileges for professional incompetency, and for SMH's publishing the false statement that Dr. Wuchenich is professionally incompetent during the post June 1, 1997 portion of the Board of Medicine's investigation of the allegations leading to Dr. Wuchenich's suspension; (9) affirm the district court's dismissal of Dr. Wuchenich's claims alleging tortious interference with the Physician Guarantee Agreement and any implied agreement between SMH and Dr. Wuchenich to abide by SMH's Bylaws; (10) vacate the district court's dismissal of Dr. Wuchenich's claim alleging the Defendants tortiously interfered with his contractual expectancy of entering into contractual relationships with some patients at SMH; and (11) remand all vacated claims for further proceedings.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED

31